STATE OF LOUISIANA

COURT OF APPEAL, THIRD CIRCUIT

08-504


KENNETH WALTER TIEDEMAN, JR.

VERSUS

EDWARD CALVERT, M.D., ET AL.


**********
APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2005-568
HONORABLE ROBERT LANE WYATT, DISTRICT JUDGE
**********

CHRIS J. ROY, SR.[1]
JUDGE

**********

Court composed of John D. Saunders, James T. Genovese, and Chris J. Roy, Judges.


**REVERSED.**


Martha Ann O'Neal
P. O. Box 1055
DeRidder, LA 70634
(337) 462-6051
Counsel for Plaintiff/Appellant:
     Kenneth Walter Tiedeman


Richard B. Cappel
Raggio, Cappel, etc.
P. O. Box 820
Lake Charles, LA 70602
(337) 436-9481
Counsel for Defendant/Appellee:

---

[1]Judge Chris J. Roy, Sr. appointed judge pro tempore of the Court of Appeal, Third Circuit.

**Robert Neal Brown, M.D.**

**John Layne Hammons**
**Nelson & Hammons**
**705 Milam Street, Suite A**
**Shreveport, LA 71101**
**(318) 227-2401**
**Counsel for Defendant/Appellee:**
    **Robert Neal Brown, M.D.**

**James R. Shelton**
**Durio, McGoffin & Stagg**
**P. O. Box 51308**
**Lafayette, LA 70505-1308**
**(337) 233-0300**
**Counsel for Defendant/Appellee:**
    **Scott Mills, M.D.**

**Patrick Scott Jolly**
**Watson, Blanche, Wilson**
**P.O. Drawer 2995**
**Baton Rouge, LA 70821-2995**
**(225) 387-5511**
**Counsel for Defendant/Appellee:**
    **West Calcasieu Cameron Hospital**

**ROY, Judge (pro tempore)**.

The plaintiff-appellant, Kenneth Tiedeman, appeals the trial court's granting of the motion for summary judgment filed by the defendant-appellee, Robert Neal Brown, M.D. For the following reasons, we reverse.

## FACTS

On January 16, 2002, Tiedeman went to the emergency room of West Calcasieu-Cameron Hospital ("West Cal-Cam") with severe pain in his right testicle. He complained the testicle was "drawn up" and felt swollen. The emergency room physician ordered a testicular ultrasound and a color Doppler study that were read that day by defendant, Dr. Scott Mills.

The radiology report indicated an enlarged right epididymis, the long tube on the posterior surface of the testis constituting the beginning of the vas deferens, with an associated small right hydrocele. Tiedeman was given an antiobiotic and discharged with instructions to rest in bed for one to two days, drink plenty of liquids, elevate his scrotum, use an ice pack at fifteen-minute intervals, and call his family physician for a recheck in fourteen days. The diagnosis was epididymitis, an inflammatory condition treatable with antibiotics.

Tiedeman returned to the West Cal-Cam emergency room on Sunday, January 20, 2002, reporting pain and swelling that had worsened since his visit four days prior. The emergency room physician ordered a repeat ultrasound that was sent to a "night hawk radiologist."[2]

Because of decreased hospital staff on weekends, West Cal-Cam used the "night hawk" service for emergency studies when necessary. The hospital transmitted

---

[2]Tiedeman's brief erroneously states the ER physician on duty on January 20, 2002 "referred the matter to Robert N. Brown, M.D., radiologist, for additional x-rays and review."

1

Tiedeman's ultrasound and possibly the color Doppler studies to the service in Houston, Texas, where they were interpreted by Dr. Frank Powell, who was never made a defendant in this case. Dr. Powell found an enlarged right epididymis but no testicular torsion. He did not interpret the studies as showing an enlarged or abnormal testicle.

On January 21, 2002, five days after Tiedeman's discharge from the emergency room, Dr. Brown reviewed the second ultrasound and color Doppler studies and compared them to the ultrasound of January 16. He found the testicle had changed in appearance, increased in size, and looked abnormal. However, he felt the color Doppler study showed continued normal blood flow to the testicle, and thus, he did not believe Tiedeman had a "torsed testicle." The "impression" section of his report stated:

1. Right testicle is enlarged and diffusely abnormal as described and has changed in appearance since the previous exam of 1-16-2002. Presumably findings would represent diffusely inflamed right testicle or orchitis.

2. Otherwise no definite abnormalities are identified.

On January 22, 2002, Tiedeman continued to have problems, so he went to the Veteran's Administration Hospital in Alexandria, Louisiana. The diagnosis there was a tortuous testicle that had become necrotic; the testicle had died, and it had to be surgically removed.

Tiedeman originally sued the emergency room doctors who saw him on January 16 and January 20, 2002, along with Dr. Mills, Dr. Brown, and West Cal-Cam. After a voluntary dismissal of the ER doctors and the hospital, only Dr. Mills and Dr. Brown remained as defendants. Dr. Brown filed this motion for summary judgment on the issue of causation, arguing he did nothing to cause or contribute to

2

Tiedeman's losses because the testicle was already necrotic at the time the ultrasound and Doppler studies were submitted for his review.

In opposition to the motion, Tiedeman filed the affidavit of Dr. Mark Collins, his radiology expert. Dr. Collins opined in the affidavit that Dr. Brown deviated from the standard of care by failing to identify testicular torsion on the January 20, 2002 ultrasound. Dr. Collins' affidavit also stated that this deviation caused Tiedeman to fail to have the proper knowledge to seek other medical care during a time when the torsion could have been corrected. In his earlier deposition, Dr. Collins testified the likelihood of saving the testicle was "approaching zero" at the time of Dr. Brown's interpretation, but he did not rule out the possibility that the testicle could have been saved.

The trial court granted Dr. Brown's motion, finding that any misinterpretation by Dr. Brown (this disputed issue was left undecided) did not cause any discernible injury to Tiedeman, and dismissed the claims against him at Tiedeman's cost. Tiedeman now appeals. Dr. Brown asks this court to award damages for a frivolous appeal.

## ISSUE

Does Dr. Collins' affidavit present a genuine issue of material fact regarding causation that precludes summary judgment in this case?

## DISCUSSION

The appellate courts review summary judgments de novo, and thus, ask the same questions as the trial courts to determine whether summary judgment is appropriate. *Magnon v. Collins*, 98-2822 (La. 7/7/99), 739 So.2d 191. Summary judgment is proper only when it is inevitable that reasonable minds would conclude

no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law. La.Code Civ.P. art. 966(B); *Renfro v. Burlington Northern and Santa Fe RR*, 06-952 (La.App. 3 Cir. 12/6/06), 945 So.2d 857, *writ denied*, 07-0303 (La. 4/27/07), 955 So.2d 644, citing *Natchitoches Parish Hosp. Serv. Dist. v. Rachal*, 94-995 (La.App. 3 Cir. 2/1/95), 649 So.2d 1152, *writ denied*, 95-0528 (La. 4/7/95), 652 So.2d 1349. Thus, summary judgment should be rendered in favor of the movant if the pleadings, depositions, answers to interrogatories, admissions on file, and affidavits show a lack of factual support for an essential element of the opposing party's claim. La.Code Civ.P. art. 966 (B) and (C). If the opposing party cannot produce evidence to suggest he will be able to meet his evidentiary burden at trial, no genuine issues of material fact exist.

A fact is "material" when "it potentially insures or precludes recovery, affects a litigant's ultimate success, or determines the outcome of a legal dispute." *Hines v. Garrett*, 04-806, p. 1 (La.6/25/04), 876 So.2d 764, 765; *Soileau v. D&J Tire, Inc.*, 97-318 (La.App. 3 Cir. 10/8/97), 702 So.2d 818, *writ denied*, 97-2737 (La. 1/16/98), 706 So.2d 979. In deciding whether certain facts are material to an action, the courts look to the applicable substantive law. *Id.* Summary judgment procedure is favored and designed to secure the just, speedy and inexpensive determination of every action. La.Code Civ.P. art. 966(A)(2). It is an appropriate vehicle both as to findings of liability and damages in a medical malpractice case. *Bijou v. Alton Ochsner Med. Found.*, 95-3074 (La. 9/5/96), 679 So.2d 893.

In a medical malpractice action, the plaintiff has the burden of proving:

(1)     The degree of knowledge or skill possessed or the degree of care ordinarily exercised by physicians, dentists, optometrists, or chiropractic physicians licensed to practice in the state of Louisiana and actively practicing in a similar community or locale

4

and under similar circumstances; and where the defendant practices in a particular specialty and where the alleged acts of medical negligence raise issues peculiar to the particular medical specialty involved, then the plaintiff has the burden of proving the degree of care ordinarily practiced by physicians, dentists, optometrists, or chiropractic physicians within the involved medical specialty.

(2)     That the defendant either lacked this degree of knowledge or skill or failed to use reasonable care and diligence, along with his best judgment in the application of that skill.

(3)     That as a proximate result of this lack of knowledge or skill or the failure to exercise this degree of care the plaintiff suffered injuries that would not otherwise have been incurred.

La.R.S. 9:2794(A). Thus, a plaintiff must prove, by a preponderance of the evidence, (1) that the doctor's treatment fell below the standard of care expected of a physician in his medical speciality, and (2) the existence of a causal relationship between the alleged negligent treatment and the injury sustained. *Fusilier v. Dauterive*, 99-692 (La.App. 3 Cir. 12/22/99), 759 So.2d 821, *writ granted*, 00-0151 (La. 3/24/00), 757 So.2d 646, *rev'd on other grounds*, 00-0151 (La. 7/14/00), 764 So.2d 74.

The plaintiff need not show that the doctor's conduct was the only cause of harm, nor must all other possibilities be negated. A plaintiff must show, however, a causal connection between his injuries and the doctor's conduct. *Pfiffer v. Correa*, 94-0924 (La. 10/17/94), 643 So.2d 1228. The test for determining a causal connection is whether the plaintiff proved through medical testimony that it is more probable than not that his injuries were caused by the substandard care. *LeBlanc v. Barry*, 00-709 (La.App. 3 Cir. 2/28/01), 790 So.2d 75, *writ denied*, 01-1275 (La. 6/15/01), 793 So.2d 1251.

Here, Tiedeman first sought medical treatment on January 16, 2002. Affidavits of Dr. James L. Moss and Dr. E. Daniel Willett, submitted by Dr. Brown, indicate

they believe Tiedeman was experiencing testicular torsion during his first visit to the West Cal-Cam emergency room on January 16, 2002. Dr. Brown became involved in Tiedeman's case on January 21, 2002, when he read the second ultrasound and color Doppler studies. By that time, Drs. Moss and Willett attest the testicle was already infarcted and necrotic, with no potential for salvage. They believe the window of opportunity to save the testicle had long passed, and the changes Dr. Brown noted between the first and second studies probably indicated the irreversible damage that had occurred to the testicle during the time between the two studies.

However, Dr. Mark Collins, plaintiff's radiology expert, testified Dr. Brown breached the appropriate standard of care. Dr. Brown failed to identify an "ischemic testis," which, Dr. Collins testified, "has to be surgically explored." Although Dr. Collins thought the studies Dr. Brown reviewed showed signs of infarction, he testified surgery at that time could have possibly salvaged the testicle. The only possible way to know whether it could be saved was by surgery – and surgery was never an option because of Dr. Brown's misdiagnosis. Had Dr. Brown properly diagnosed a torsion, according to Dr. Collins, "the onus [would be] on the urologist to explore it and possibly remove [the testicle] or see if it pinks up."

Dr. Collins' affidavit is consistent with this deposition testimony. The affidavit again states Dr. Brown deviated from the required standard of care by improperly interpreting the ultrasound, which revealed testicular torsion. Because of Dr. Brown's misdiagnosis, Tiedeman failed "to have the knowledge to seek other medical assistance during a crucial time that the torsion could have been corrected."

Summary judgment is improper where a genuine issue of material fact exists. La.Civ.Code Art. 966. Such a factual issue exists here. Dr. Brown's experts say he

6

did nothing to contribute to the harm suffered by Tiedeman. Tiedeman's expert says Dr. Brown deprived Tiedeman of knowledge that might have encouraged surgery during a time that may have prevented the harm. This factual dispute precludes summary judgment.

## FRIVOLOUS APPEAL

Dr. Brown argues Tiedeman's appeal is frivolous because it makes material misrepresentations of fact and because Dr. Collins concurred with the opinions of Drs. Moss and Willett, that the window of opportunity for saving the testicle had passed by the time of Dr. Brown's involvement. Because we find the appeal has merit, and we reverse the grant of summary judgment, the issue of frivolous appeal is moot.

## CONCLUSION

The trial court erroneously granted summary judgment in this case. A genuine issue of material fact exists regarding the relationship between Tiedeman's injuries and Dr. Brown's conduct. This factual issue is appropriately decided at trial. Thus, the trial court's judgment granting Dr. Brown's motion for summary judgment is reversed. All costs of this appeal are assessed against the defendant-appellee, Dr. Robert Brown.

**REVERSED.**