1 PCIiE HARDY, Judge.
Defendant, Wal-Mart Stores, Inc. (“Wal-Mart”), appeals from a judgment in a personal injury suit filed by plaintiff, Hope Branch (“Branch”), for injuries she received from falling merchandise. Branch appeals the amount of damages awarded. We affirm.

Facts

On January 2, 1995, at approximately 9:00 p.m., Branch, her teenage son, and his friend were shopping in the sporting goods section of a Wal Mart store in Kenner, Louisiana. According to Branch and the two boys, Branch was standing in the aisle of the store while the two boys were trying on hunting apparel when an ice chest fell from an upper shelf and struck her on the head. All three testified that there were few shoppers in the sporting goods area that night and, in fact, they had been alone on the aisle for about ten to fifteen minutes. They also testified that none of them had bumped the shelf that held the ice chest or attempted to remove the ice chest before it fell.
Branch testified that, about thirty seconds after the ice chest fell, a Wal-Mart employee, Herman Eicke, arrived to investigate. She reportedly told him that she did not need to speak to a manager because she was “okay” but, a few | aminutes later, after she began to experience pain, she returned and asked him to contact a manager. James White, the assistant manager on duty, took Branch’s complaint and requested a statement about the incident from Eicke. White later took photographs of the aisle where the incident occurred.
A “couple of days” after the incident, Branch saw a physician for pain in her shoulders and neck and tingling in her arms. After visiting two other physicians and receiving physical therapy for her injuries, Branch was referred to a neurosurgeon who recommended a cervical fusion. Branch subsequently underwent a cervical fusion, which relieved the pain in her neck and shoulders. Branch testified that, although her pain has subsided, she still has some physical limitations as a result of the cervical fusion.
On September 27, 1995, Branch filed suit for injuries to her neck and back. At trial, Wal-Mart denied liability and challenged Branch’s version of the events. Wal-Mart suggested that another customer, using an unattended ladder, caused the ice chest to fall on Branch. Although no store employees witnessed the incident, Eicke’s statement indicated that he heard a loud noise on one of the aisles. When he arrived, a “female customer said a male customer knocked an ice chest onto her head.” Eicke also stated that the male customer admitted that he used a ladder, which was still unopened, to get the ice chest himself. Eicke recalled “tying up” the ladder on the aisle. Eicke did not ask the male customer his name before he left with the ice chest.
When White, the manager on duty, testified, he stated that the ice chest that had fallen was still in the middle of the aisle when he investigated the incident.[1] He testified that Eicke reported that an ice chest had fallen and hit a|4female customer on the head. He denied that Eicke reported to him that an unknown male customer using an unattended ladder caused the ice chest to fall on the female *799 customer’s head. The manager’s report of the incident does not mention anyone other than Branch and simply states, “Customer said ice chest fell from top shelf and hit her on the top of her head.”
At the close of the evidence, the jury found Wal-Mart 100% at fault for the accident. The jury awarded Branch $90,000 in general damages and $25,353.58 for medical expenses as well as $2000 to her husband for loss of consortium.
On appeal, Wal-Mart contends that the jury manifestly erred in finding it at fault and in failing to assign fault to the unknown tortfeasor. Wal-Mart contends that Branch did not bear her burden of proof under La.R.S. 9:2800.6(A) that Wal Mart failed to exercise reasonable care to keep its aisles, passageways and floors in a reasonably safe condition. Further, Wal Mart asserts that Branch’s version of the incident in her original petition was inconsistent with the version set forth in her amended petition and trial testimony. Plaintiff appeals the amount of damages.

Falling Merchandise

La. R.S. 9:2800.6 governs negligence claims against a merchant. La. R.S. 9:2800.6(A) provides:
A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.[2]
Recently, the Louisiana Supreme Court reiterated the law for falling merchandise cases in Davis v. Wal-Mart Stores, Inc., 00-0445 (La.11/28/00), 774 So.2d 84, extensively citing its pronouneement in Smith v. Toys ‘R’ Us, 98-2085 (La.11/30/99), 754 So.2d 209:
In a “falling merchandise” case under R.S. 9:2800.6(A), as in the present case, the standard is that the merchant must use reasonable care to keep its aisles, passageways and floors in a reasonably safe condition and free of hazards which may cause injury. Further, a plaintiff who is injured by falling merchandise must prove, even by circumstantial evidence, that a premise hazard existed. Once a plaintiff proves a prima facie premise hazard, the defendant has the burden to exculpate itself from fault by showing that it used reasonable care to avoid such hazards by means such as periodic clean up and inspection procedures.
To prevail in a falling merchandise case, the customer must demonstrate that (1) he or she did not cause the merchandise to fall, (2) that another customer in the aisle at that moment did not cause the merchandise to fall, and (3) that the merchant’s negligence'was the cause of the accident: the customer must show that either a store employee or another customer placed the merchandise in an unsafe position on the shelf or otherwise caused the merchandise to be in such a precarious position that eventually, it does fall. Only when the customer has negated the first two possibilities and demonstrated the last will he or she have proved the existence of an “unreasonably dangerous” condition on the merchant’s premises.
Under Smith, though evidence of adequate inspection and clean up procedures may yet be part of the merchant’s *800 burden to disprove negligence, evidence of the opposite is certainly relevant as part of the customer’s burden to prove negligence: plaintiff customer will carry his or her burden if he or she can make a prima facie showing that inadequate or neglected inspection and clean up procedures left merchandise in such an unstable or precarious position that it falls from its stacked or displayed position to cause injuries to him or her. (Citations omitted).
774 So.2d at 90. Importantly, the hazardous condition may still be proved by either direct or circumstantial evidence, and, further, findings of fact regarding such hazardous conditions in falling merchandise cases made at trial level are given manifest error review. Smith, 754 So.2d at 211.
IfiAt trial, Branch, her son and his friend all testified, thus offering direct evidence, that no other person, not another customer nor any Wal Mart employee, had been in the sporting goods aisle with them for at least ten minutes before the ice chest fell. Further, all three testified positively that they had not touched the ice chest or caused them to fall.
Wal-Mart introduced testimony from Eicke, the Wal-Mart employee who first spoke with Branch, to rebut Branch’s and the boys’ testimony. Eicke testified that, when he arrived on the camouflage aisle after hearing a crash, he found a man on a ladder, an ice chest on the floor, and Branch and the two boys. He stated that Branch told him that the man on the ladder knocked the ice chest, which hit her in the head, off of the upper shelf. Eicke did not determine the man’s name before he let the man leave because Branch stated that she was “okay.” Eicke stated that the man took the ice chest with him when he left the area.
At trial, however, White, the assistant manager, basically rebutted Eicke’s testimony. White testified that, when Eicke reported the incident to him, Eicke did not mention that another customer on a ladder knocked the ice chest off of the shelf. White also stated that he did not see a ladder on the aisle when he arrived to investigate the incident but that he did see an ice chest on the floor.
The issue for the reviewing court is not whether the trier of fact was wrong, but whether the factfinder’s conclusions were reasonable under the evidence presented. Smith, 754 So.2d at 214. In the present case, the jury determined that an ice chest fell from the upper shelf onto Branch’s head and that neither she nor any other customer in the area caused the ice chest to fall. After hearing all of the testimony, the jury found Branch, the boys, and White to be more credible witnesses than Eicke. Further, they found no inference of negligence on the part 17of Branch or the two boys. We cannot disturb this finding on appeal. Smith, 754 So.2d at 212.
Our next inquiry is whether Branch met her burden of proof that the merchant’s negligence was the cause of the accident. Branch, in her case-in-chief, presented the following evidence regarding Wal-Mart’s observance of its duty to keep the aisles clean and safe. John White, the assistant manager at Wal-Mart on the day of the incident, testified regarding general inspection and clean-up procedures. White, testified that such inspections were done visually only, and that employees did not use any other systematic method to insure that merchandise was securely placed on displays or shelves. He testified that there was no set schedule for such inspections and that the manager on duty at closing time determined how frequently the inspections were done.
*801 Branch introduced photographs of Wal-Mart’s ice chest aisle, taken one or two months after the incident, into evidence at trial. One of the photographs depicts three large ice chests stacked on top of each other on the top riser of the shelving unit. Branch also introduced copies of Wal-Mart’s training materials on customer safety and stocking. The customer safety materials instructed Wal-Mart employees as follows:
Merchandise must be stable and not be stacked so high that it could fall to the floor. Be especially careful with merchandise stored on risers.[3]
[[Image here]]
Fasten large or heavy display items to the shelves with safety ties. Crossbars can be used to prevent merchandise from falling.
The stocking materials instructed Wal-Mart employees as follows:
Don’t stack risers too high. Don’t stack merchandise on the shelves so that it is easy for it to fall.
1 sWhite, the assistant manager, testified that there were no specific rules for stacking large “saleable” items like ice chests. He testified that the managers encouraged each employee to use their own common sense in stocking such items. He did not know who had stocked the merchandise in question. He did admit that if the ice chest had been fastened to the shelving unit with safety ties as Wal-Mart training materials instruct, the possibility of the ice chest falling from the shelf would have been much smaller.
Wal-Mart, in its case-in-chief, presented testimony from Eicke, who stated that on the evening in question, he had performed a visual inspection of the sporting goods area. He testified, however, that he did not stock the ice chests on the riser but he thought that the overnight stocking crew had stocked that area. He also stated that he was not aware of the instructions in the training materials to fasten large items to the shelving unit because he was hired before training with those materials was instituted. Wal-Mart, however, did not present testimony from its employee who had actually stacked the ice chests on the riser. Wal-Mart did not introduce the photographs that White, the assistant manager, testified that he took of the ice chest aisle on the night of the incident.
Again, the issue for the reviewing court is not whether the trier of fact was wrong, but whether the factfinder’s conclusions were reasonable based on the evidence presented. Here, the jury found that Branch established by a preponderance of the evidence, both direct and circumstantial, that an ice chest hit her on the head in Wal-Mart because a store employee placed the merchandise in an unsafe position on the shelf or otherwise caused the merchandise to be in such a precarious position that eventually it fell. The jury also found that Wal-Mart did not present sufficient evidence, direct or circumstantial, to rebut the implication of negligence in the manner in which its |aemployee or employees stacked the ice chest that eventually fell and injured Branch.
The court of appeal may not set aside the trial court’s findings of fact, in the absence of manifest error or unless the findings are clearly wrong. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). Furthermore, “where two permissible views of the evidence exists, the factfinder’s choice between them cannot be manifestly erro *802 neous or clearly wrong.” Stobart v. State, 617 So.2d 880, 882-883 (La.1993). Based on the evidence, we find that the jury did not err in finding that, at the time of the incident, a premise hazard existed at Wal-Mart.

Damages

Turning now to Branch’s error on appeal, we also agree that the jury was correct in its assessment of general damages for her injuries that resulted from the accident.
Just a few minutes after the incident, while she was still in Wal-Mart, Branch began to feel pain in her neck and back. Her son stated that she looked very pale. When she got home that evening, she discovered that she had a large bump on her head and soreness in her shoulder and neck and headaches. The next day, she made an appointment to see a doctor covered by her insurance policy but the earliest appointment that she could get was two days after the incident. On January 4, 1995, Branch saw Dr. William Brandon for the pain in her neck and back and tingling in her arms. He prescribed medication to relax the muscles.
On March 21, 1995, Branch visited Dr. Stewart Altman, a general surgeon, who diagnosed her with a cervical spine sprain, upper and mid-back sprain, left shoulder sprain, and left elbow sprain. He prescribed medication and physical therapy for her. Branch had five clinical office visits with Dr. Altman between March 21, 1995 and June 15, 1995. She also attended sixteen physical therapy |insessions at the clinic in the same time frame. On June 15, 1995, Branch still complained of headaches and neck and upper back. Dr. Altman determined that Branch had reached maximum medical benefit with conservative therapy and recommended that she see an orthopedist. Dr. Altman also ordered an MRI, which was performed on July 17, 1995.
Dr. Altman referred Branch to a neurosurgeon, Dr. Toussaint LeClercq, who reviewed the MRI. On September 25, 1995, Dr. LeClercq found that the MRI revealed a herniated cervical disc at C5-C6 and recommended a cervical fusion. Branch eventually agreed to the surgery, which was performed on June 18, 1996.
Branch stated that even though she was “terrified,” she agreed to the surgery because she was in a tremendous amount of pain. For two months after the surgery, Branch’s movements were severely restricted. She could not drive or bend over or bathe herself. She still has physical restrictions as a result of the surgery, including lifting restrictions. Although she does not experience pain in her neck or shoulders, she does not feel that she has been restored to her pre-accident condition. She explained that she felt that she had to be very careful in her activities because she was afraid of damaging her neck again.
Dr. LeClercq testified at trial that the pain and numbness in Branch’s neck and arms was caused by the ice chest striking her on the head. Further, there was no question that this was a new injury and not an injury that had occurred over time. Dr. LeClercq also explained that the fusion restricted the movement in her neck, and she now has an increased risk of a ruptured disk above or below the area of fusion.
In the assessment of damages in cases of offenses and quasi offenses, much discretion must be left to the judge or jury. La. C.C. art. 2324.1. Absent a determination that the trial court’s very great discretion in the award of general damages has been abused in the matter under review, the reviewing court should *803 Innot disturb the trier’s award. Mannina v. Wal-Mart Stores, Inc., 99-1102 (La.App. 5 Cir. 2/29/00), 757 So.2d 98, 106. The discretion vested in the trier of fact is “great,” and even vast, so that an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993); Mannina, supra. We cannot say that the jury abused its great discretion in the instant matter in awarding Branch $90,000 in general damages and $25,353.58 for medical expenses as well as $2,000 to her husband for loss of consortium.
For the above reasons, we affirm the trial court’s judgment in all respects. Wal-Mart is to bear all costs of appeal, including those incurred by Branch.

AFFIRMED.

. Branch, her son, and his friend all testified that Branch waited for a manager in the sporting goods area for "a while” but they eventually went to the customer service desk to file the incident report. They all testified that the manager did not meet them at the aisle where the incident occurred.

. La. R.S. 9:2800.6(B) as amended in 1990, delineates the merchant’s liability for falls on the premises and sets forth a heightened burden of proof for a claimant. That provision, however, applies only to 'Tails” and, therefore, is inapplicable here. See Smith v. Toys 'R' Us, Inc., 754 So.2d at 212, n. 2.

. Risers are the upper shelves that are attached to the metal display units that house merchandise in Wal-Mart’s stores.